UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| COURTLAND ALISTER BLAYLOCK, <br><br> Plaintiff, <br><br> vs. <br><br> SOUTH DAKOTA DEPARTMENT OF CORRECTIONS; SECRETARY KELLIE WASKO, in her individual and official capacities; WARDEN ALEJANDRO REYES, in his individual and official capacities; UNIT MANAGER DEB EILERS, in her individual and official capacities; CHIEF MEDICAL OFFICER AARON HAYNES, in his individual and official capacities; CORRECTIONAL OFFICER MYERS, in his individual capacity; CORRECTIONAL OFFICER JOHN DOE 1, in his individual capacity; UNKNOWN DOC MEDICAL STAFF DOES 2–5, in their individual capacities; and OTHER UNKNOWN MDSP STAFF, in their individual capacities, <br><br> Defendants. | 4:25-CV-04104-CCT <br><br><br> **1915A SCREENING OF SECOND AMENDED COMPLAINT** |

Plaintiff, Courtland Alister Blaylock, filed a pro se civil rights lawsuit under 42 U.S.C. § 1983 against Kellie Wasko, the former South Dakota Secretary of Corrections and "correctional officials responsible for [his] housing, safety, and medical care," alleging that they were deliberately indifferent to his serious medical needs in violation of his Eighth Amendment right to be free from cruel and unusual punishment. Docket 13. Blaylock's amended complaint

also included a failure to protect claim arising out of a stabbing that occurred in July or August of 2024. *Id.* The Court granted Blaylock leave to proceed in forma pauperis and screened his amended complaint, Docket 13, under 28 U.S.C. § 1915A. Docket 15. The Court dismissed Blaylock's claims without prejudice for failure to state a claim upon which relief can be granted under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1). *Id.* at 12–20. But the Court granted Blaylock leave to file a second amended complaint. *Id.* at 20–21, 24. Blaylock timely filed a second amended complaint, Docket 18, which the Court now screens under 28 U.S.C. § 1915A.

## I.    1915A Screening

### A.    Factual Background Alleged by Blaylock

#### 1.    Parties

In his second amended complaint, Blaylock alleges claims under § 1983 for violating his Eighth Amendment rights, Title II of the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act. Docket 18 ¶ 11. Blaylock's claims arise out of his incarceration at Mike Durfee State Prison (MDSP). *Id.* ¶¶ 1, 15. Blaylock sues the South Dakota Department of Corrections (DOC) because it is the state entity responsible for the operation of MDSP. *Id.* ¶ 16. Blaylock alleges that the DOC is a "public entity" under Title II of the ADA. *Id.* He also alleges that the DOC receives federal financial assistance within the meaning of Section 504 of the Rehabilitation Act. *Id.*

Individual defendants include Kellie Wasko, the former Secretary of Corrections; Alejandro Reyes, the Warden of MDSP; Deb Eilers, a Unit Manager

at MDSP responsible for housing-related decisions and responses concerning Blaylock's safety and placement; Dr. Aaron Haynes, the Medical Director and Chief Medical Officer for the DOC; Correctional Officer Myers; and Correctional Officer John Doe 1. *Id.* ¶¶ 17, 18, 19, 20, 21, 22. Blaylock sues Myers and John Doe 1 in their individual capacities. *Id.* ¶¶ 21, 22. He sues Wasko, Reyes, Eilers, and Haynes in their individual capacities for damages and in their official capacities for "declaratory and prospective relief to the extent such relief is permitted by law." *Id.* ¶¶ 17, 18, 19, 20. Blaylock also names Unknown Medical Staff Does 2–5[1] as defendants in their individual capacities. *Id.* ¶ 23. Finally, Blaylock also names "Other Unknown MDSP Staff [who] were . . . involved in housing, safety, classification, supervision, transportation, segregation, or related decisions affecting [him]." *Id.* ¶ 24. The Unknown MDSP Staff are sued in their individual capacities. *Id.*

### 2. West Hall Stabbing Incident

Blaylock was in the custody of the South Dakota DOC from May 2024 to June 2025. *Id.* ¶ 2. On intake, Blaylock disclosed a history of trauma and was classified as a vulnerable person. *Id.* ¶¶ 2, 26. Blaylock's vulnerable person classification, Blaylock believes, was documented in the DOC's classification records. *Id.* ¶¶ 27, 30. Despite his designation, Blaylock was placed in West

---

[1] Blaylock describes these unknown defendants as "medical personnel, reviewers or higher-level decisionmakers involved in denying or blocking [his] narcolepsy medication, denying or rejecting referrals, refusing equivalent psychiatric treatment, or failing to implement accommodations." Docket 18 ¶ 23.

Hall, a "violent and unstable housing unit, without meaningful individualized safety analysis or protective placement." *Id.* ¶ 28.

In July 2024, when Blaylock was housed in West Hall, another inmate stabbed him in the dayhall entryway. *Id.* ¶ 31. The stabbing caused a cut on Blaylock's forehead, two cuts on his forearm, other bleeding wounds, pain, and permanent visible scarring. *Id.* ¶ 33. Because of the assault, Blaylock has suffered fear, psychological trauma, and emotional distress. *Id.* ¶ 34. Myers and John Doe 1 observed the other inmate begin to stab Blaylock but did not intervene in the altercation for three to five minutes. *Id.* ¶ 35. Before the assault, Myers and John Doe 1 had access to classification and housing information reflecting Blaylock's vulnerable person status and the known violence in West Hall. *Id.* ¶ 37. As the altercation continued, Myers and John Doe 1 had "a clear line of sight, the physical ability to act, and a realistic opportunity to stop or reduce the assault, but they remained passive while [Blaylock] was repeatedly struck with a sharpened weapon." *Id.* ¶ 36. The delay in intervention caused additional injury, pain, fear, and psychological trauma. *Id.* ¶ 38.

### 3.    Continued Failure to Protect

After the West Hall stabbing incident, Blaylock alleges that he remained in "dangerous housing[.]" *Id.* ¶ 96. Blaylock, as well as other inmates, reported the danger to staff. *Id.* Blaylock submitted refusal-to-move slips stating that he could not safely remain where he was housed and reporting that his life was in danger. *Id.* ¶ 97. Staff responded that if Blaylock refused housing he would be

4

placed in the Special Housing Unit (SHU). *Id.* ¶ 98. This response, according to Blaylock, "effectively coerced him into remaining in dangerous housing" despite his vulnerable person classification. *Id.* ¶ 99. Despite Blaylock's "classification, prior assault, repeated danger reports, and refusal-to-move slips," Reyes and Eilers kept Blaylock in "unsafe housing for months without meaningful protective measures." *Id.* ¶ 100.

Approximately a month before his release, Blaylock alleges that another inmate assaulted him, resulting in a significant black eye. *Id.* ¶ 101. After this incident, Blaylock and the other inmate were taken to segregation, and Blaylock was then placed in East Hall. *Id.* ¶¶ 102, 104. Blaylock contends that East Hall is also violent and unsafe. *Id.* ¶ 104. Within hours after arriving in East Hall, Blaylock "checked in" because he believed his life was in immediate danger from credible threats. *Id.* ¶ 105. After checking in, Blaylock was placed in the SHU for seven days. *Id.* ¶ 106. While in the SHU, staff told Blaylock that if he did not provide more detail than stating that his life was in imminent danger, he would be returned to East Hall. *Id.* ¶ 107. Blaylock refused to return to East Hall, and staff did not force Blaylock to return to East Hall. *Id.* ¶ 110. But Blaylock contends that he was placed in unsafe housing "without a meaningful safety plan." *Id.*

### 4.    Narcolepsy and Anxiety

Before his May 2024 incarceration, Blaylock sought treatment for narcolepsy and psychiatric conditions, including anxiety. *Id.* ¶¶ 40, 43. An outside provider initially prescribed modafinil for narcolepsy, but then

prescribed armodafinil when modafinil was no longer working well. *Id.* ¶¶ 44, 45, 47, 49, 50. An outside provider also documented that diazepam worked better for Blaylock's anxiety than alprazolam. *Id.* ¶ 50.

According to Blaylock's May 2024 intake records, he reported narcolepsy, depression, and anxiety, and he arrived with medications including armodafinil, bupropion, escitalopram, diazepam, and chlorhexidine. *Id.* ¶ 55. On May 13, 2024, an initial provider assessment documented that Blaylock's history includes narcolepsy, anxiety, major depressive disorder, PTSD, mood disorder, and ADHD/ADD, and stated that Blaylock had entered custody with non-formulary medications including armodafinil, bupropion, chlorhexidine, escitalopram, and diazepam. *Id.* ¶ 56. DOC correspondence dated May 15, 2024, stated that diazepam was rejected as non-formulary and noted that Dr. Haynes had indicated that diazepam was a poor medication to take chronically for anxiety. *Id.* ¶¶ 57, 78. Instead, Blaylock was prescribed hydroxyzine for anxiety, but he contends that it did not adequately control his symptoms. *Id.* ¶ 80. Armodafinil, the medication Blaylock had been prescribed for narcolepsy, is also non-formulary but Blaylock was permitted to finish his current supply while non-formulary approval was pending. *Id.* ¶¶ 58, 78.

At the end of May 2024, Blaylock requested armodafinil and was scheduled to be seen by a provider during sick call. *Id.* ¶¶ 59, 60. The provider noted that Blaylock's outside records indicated that he had been diagnosed with narcolepsy, but the records did not include any definitive diagnostic testing. *Id.* ¶ 60. Blaylock was notified that his request for armodafinil had

6

been rejected and that proper diagnostic testing was required before it would be considered. *Id.* ¶¶ 61, 62. On June 20, 2024, Blaylock reported that he needed armodafinil for narcolepsy, stated that he had daytime sleep episodes, and indicated that he had previously been diagnosed with narcolepsy and had benefitted from armodafinil. *Id.* ¶ 67. DOC correspondence dated June 24, 2024, notified Blaylock that there were no new orders and his request for armodafinil had been rejected. *Id.* ¶ 68.

On August 12, 2024, Reyes signed an Administrative Remedy Response noting that multiple requests for armodafinil had been submitted and denied, stating that Blaylock's chart did not contain a proper diagnosis or attempts by Blaylock to work with a provider to obtain a diagnosis, and recommending that Blaylock kite health services if he wanted testing. *Id.* ¶ 72. Blaylock submitted a kite on August 22, 2024, requesting to be seen for a second opinion regarding narcolepsy, and he was scheduled for an appointment with psychiatry. *Id.* ¶ 73.

A sick call note dated September 17, 2024, stated that Blaylock had been diagnosed with narcolepsy when he was twelve or thirteen and started on medications at that time. *Id.* ¶ 74. At approximately the same time, DOC correspondence informed Blaylock that armodafinil is not prescribed in the DOC. *Id.* On October 14, 2024, Blaylock was notified that he had been scheduled for a provider sick call regarding narcolepsy. *Id.* ¶ 76. Blaylock was also notified that he had been scheduled for a provider appointment regarding narcolepsy on February 26, 2025. *Id.* ¶ 79.

It appears that Blaylock attempted to appeal the denial of armodafinil to Wasko, who was the Secretary of Corrections, but was informed that the issue could not be appealed to the Secretary. *Id.* ¶ 77. When Wasko responded to Blaylock's attempted appeal, she stated that the "Chief Medical Officer would not consider the medication without proper testing and that [Blaylock] should kite Health Services if he wished to pursue the testing." *Id.* By correspondence dated March 11, 2025, Blaylock was notified that a provider's request that he see neurology for narcolepsy had been denied, but he had been scheduled for a sleep study and planned to speak with mental health regarding sleeping concerns. *Id.* ¶ 87.

After his release, Blaylock resumed treatment with outside providers. *Id.* ¶ 112. On June 16, 2025, an outside provider noted that Blaylock had not been given his regular medications during his incarceration other than Lexapro,[2] but Lexapro did not help Blaylock's anxiety or narcolepsy. *Id.* ¶ 113. At Blaylock's request, the outside provider restarted diazepam for anxiety, armodafinil for narcolepsy, and bupropion for depression. *Id.* ¶ 114. From October 2025 through January 2026, Blaylock continued treatment for narcolepsy, anxiety, and depression, and continued to take armodafinil, diazepam, and bupropion. *Id.* ¶ 115.

---

[2] Escitalopram is the generic form of Lexapro. *Lexapro*, Drugs.com, https://www.drugs.com/lexapro.html (last visited July 20, 2026).

### 5.    No-Machinery Restriction

Blaylock's DOC medical records reflect a "no operating machinery" restriction based on narcolepsy and daytime sleep episodes. *Id.* ¶¶ 65, 84. On March 10, 2025, Blaylock requested ADA accommodation paperwork from Health Services. *Id.* ¶ 86. The requested ADA accommodation form was not provided, and "no meaningful individualized accommodation analysis occurred." *Id.* ¶ 88. Despite the no operating machinery restriction, Blaylock was assigned to a construction technology class that required the operation of table saws and other dangerous machinery. *Id.* ¶ 89. Blaylock participated in a construction technology class supervised by Al Mudder,[3] a DOC employee. *Id.* ¶ 90. After Blaylock completed the written coursework, Mudder allowed Blaylock to operate table saws and other dangerous power equipment. *Id.* ¶ 91.

Health Services and DOC staff failed to inform Mudder of the no operating machinery restriction. *Id.* ¶ 93. At the time that Mudder allowed Blaylock to operate dangerous equipment, Blaylock had repeatedly reported involuntary sleep episodes, fatigue, inability to stay awake, and denial of narcolepsy medication through kites, sick-call requests, and grievances. *Id.* ¶ 92. Mudder observed Blaylock's visible fatigue and difficulty staying awake, but Mudder "had not been given meaningful guidance because [the] DOC failed to implement a functioning accommodation or restriction process." *Id.* ¶ 94. According to Blaylock, the failure by "custody and medical staff" to enforce the

---

[3] Blaylock does not name Mudder as a defendant. *See* Docket 18 ¶¶ 16–24.

no operating machinery restriction resulted in Blaylock being placed in a machinery-based vocational class. *Id.* ¶ 95.

### 6.    Requested Relief

Blaylock requests nominal, compensatory, and punitive damages against the defendants sued in their individual capacities for physical injuries, scarring, pain and suffering, emotional distress, disability-related harm, and ongoing medical and psychiatric injury. Docket 18 ¶¶ 170, 171, 172. He seeks declaratory relief that defendants' actions violated his rights under the Eighth Amendment, Title II of the Americans with Disabilities Act (ADA), and § 504 of the Rehabilitation Act. *Id.* ¶ 173. He also seeks prospective injunctive relief against the DOC and defendants in their official capacities. *Id.* ¶ 174. Finally, he requests costs, post-judgment interest, and any other relief the Court deems just and proper. *Id.* ¶ 175.

### B.    Legal Standard

The Court's previous screening order sets forth the applicable legal standard for screening complaints under § 1915A. Docket 15 at 11–12. The Court will apply this same standard when screening Blaylock's second amended complaint.

### C.    Legal Analysis

#### 1.    Official Capacity Claims for Declaratory and Injunctive Relief

Because Blaylock is no longer incarcerated, his claims for declaratory and injunctive relief are moot. *See, e.g., Scher v. Chief Postal Inspector*, 973

F.2d 682, 683 (8th Cir. 1992) (per curiam) (citations omitted). Thus, Blaylock's claims for declaratory relief and injunctive relief against the DOC and the individual defendants in their official capacities[4] are dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

### 2.    Failure to Protect and Failure to Intervene

Blaylock's second amended complaint includes a failure-to-protect and failure-to-intervene claim against Reyes, Eilers, Myers, John Doe 1, and Other Unknown MDSP Staff. Docket 18 ¶¶ 125–133. Under the Eighth Amendment, "prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (alteration in original) (internal quotation omitted). "It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." *Id.* at 834. To prevail on a failure-to-protect claim, a prisoner must demonstrate two things. First, he must show that he is incarcerated under conditions posing a substantial risk of serious harm. *Spruce v. Sargent*, 149 F.3d 783, 785 (8th Cir. 1998). Second, an inmate must demonstrate that prison officials were deliberately indifferent to that risk. *Id.* At this stage of the proceedings, Blaylock has alleged sufficient facts to meet the first requirement. *See* Docket 18 ¶¶ 28, 31, 96, 97, 98, 99, 100, 101, 104, 105, 110.

---

[4] Kellie Wasko is no longer the Secretary of Corrections. However, because Blaylock's official capacity claims against Wasko are moot, it would be futile to substitute her successor as the Secretary of Corrections, Nick Lamb, under Federal Rule of Civil Procedure 25(d).

"Deliberate indifference requires a showing that the official knew the risk existed, but disregarded it." *Spruce*, 149 F.3d at 785. This second prong requires that "the subject prison official must have exhibited a sufficiently culpable state of mind, that is, the prison official must have been deliberately indifferent to a substantial risk of serious harm to the inmates." *Lenz v. Wade*, 490 F.3d 991, 995 (8th Cir. 2007). "[E]vidence that an official merely 'should have known' of an excessive risk of harm based on 'very obvious and blatant circumstances' does not meet the standard of deliberate indifference." *Spruce*, 149 F.3d at 786. Blaylock alleges that Myers and John Doe 1 observed another inmate stabbing him but failed to intervene in the altercation for three to five minutes. Docket 18 ¶¶ 35, 36. Thus, Blaylock's Eighth Amendment failure-to-protect claim against Myers and John Doe 1 in their individual capacities survives § 1915A screening.

Blaylock alleges that Reyes and Eilers kept him in unsafe housing for months without meaningful protective measures despite being aware of his vulnerable person classification, a prior assault by another inmate, repeated danger reports, and refusal-to-move slips. Docket 18 ¶ 100. Blaylock's Eighth Amendment failure-to-protect claim against Reyes and Eilers in their individual capacities also survives § 1915A screening. Finally, Blaylock's Eighth Amendment failure-to-protect claim against other Unknown MDSP staff involved in housing, safety, classification, and related decisions affecting Blaylock survives § 1915A screening. *Id.* ¶¶ 24, 96, 97, 98, 101, 102, 104, 105, 106, 107, 110.

12

### 3.    Deliberate Indifference to Serious Medical Needs

Blaylock alleges that Wasko, Reyes, Dr. Haynes, and Unknown DOC Medical Staff Does 2–5 are liable for deliberate indifference to his serious medical needs. Docket 18 ¶¶ 134–143. He contends that Dr. Haynes and Unknown DOC Medical Staff Does 2–5 "participated in, approved, or maintained the denial of [his] armodafinil or equivalent narcolepsy treatment, denial of neurology referral, denial of equivalent psychiatric medication, or continuation of these denials through the review process." *Id.* ¶ 82. He alleges that Wasko and Reyes were "placed on notice through grievances, appeals, and related complaints that [he] had serious untreated medical needs and associated safety consequences, yet failed to intervene." *Id.* ¶ 83.

"[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id.* at 104–05 (footnotes omitted). "This conclusion does not mean, however, that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Id.* at 105. "[A] prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.* at 106.

13

The deliberate indifference standard includes both an objective and subjective component. *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997) (citing *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997)). The plaintiff "must demonstrate (1) that [he] suffered objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs." *Id.* (citing *Coleman*, 114 F.3d at 784).

### a.    Existence of a Serious Medical Need

The Eighth Circuit has defined a serious medical need as one that has been diagnosed by a physician and requires treatment. *Presson v. Reed*, 65 F.4th 357, 366 (8th Cir. 2023) (citing *Davis v. Buchanan Cnty.*, 11 F.4th 604, 623–24 (8th Cir. 2021)). Here, Blaylock alleges that he suffers from "narcolepsy and related psychiatric conditions" that constitute serious medical needs. Docket 18 ¶ 135. Before his incarceration, he received medical treatment for these conditions. *Id.* ¶¶ 40 43, 44, 45, 47, 49, 50. His DOC intake records indicate that he reported that he had been diagnosed with narcolepsy and other psychiatric conditions, and he arrived with prescription medications for these conditions. *Id.* ¶ 55. Taking Blaylock's well-pleaded allegations as true, as is required at this stage of pleading, for the purposes of screening Blaylock has met the objective component of deliberate indifference and established that he had a serious medical need.

### b.    Deliberate Indifference

"Under the subjective prong, to show deliberate indifference, the official must know of and disregard the inmate's serious medical need." *Presson*, 65

F.4th at 367 (quoting *Davis*, 11 F.4th at 624). "Deliberate indifference is more than negligence, more even than gross negligence. It may be found where medical care is so inappropriate as to evidence intentional maltreatment." *Id.* at 366 (quoting *Johnson v. Leonard*, 929 F.3d 569, 575 (8th Cir. 2019)). *See also Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000) (allegations of negligence will not suffice, nor will mere disagreement with treatment decisions) (citing *Est. of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995)). "The level of culpability required to demonstrate deliberate indifference on the part of prison officials is equal to criminal recklessness." *Dantzler v. Baldwin*, 133 F.4th 833, 843 (8th Cir. 2025) (quoting *Holden v. Hirner*, 663 F.3d 336, 343 (8th Cir. 2011)). Blaylock alleges that Dr. Haynes, the Unknown Medical Staff Does, Wasko, and Reyes were aware that he had serious medical needs that were not being met and deliberately disregarded those needs. Docket 18 ¶¶ 134–43. Although Blaylock does not have a constitutional right to receive a particular or requested course of treatment, *see Dantzler*, 133 F.4th at 846 (quotation omitted), at this stage, the Court cannot conclude that his claims are wholly without merit. Blaylock's Eighth Amendment deliberate indifference claim against Dr. Haynes, the Unknown Medical Staff Does 2–5, Wasko, and Reyes in their individual capacities survive § 1915A screening.

### 4.    ADA and Rehabilitation Act

Blaylock alleges that the DOC is liable for violating Title II of the ADA and Section 504 of the Rehabilitation Act for refusing his requests for accommodation arising out of his narcolepsy. Docket 18 ¶¶ 144–154. Title II of

15

the Americans with Disabilities Act (ADA) provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Under the ADA, a "public entity" includes state and local governments, as well as their agencies and instrumentalities. *Id.* § 12131(1)(A), (B). "[T]he plain text of Title II of the ADA unambiguously extends to state prison inmates[.]" *Pa. Dep't of Corrs. v. Yeskey*, 524 U.S. 206, 213 (1998).

Before considering whether Blaylock has plausibly alleged an ADA or Rehabilitation Act claim against the DOC, the Court must consider whether the Eleventh Amendment bars Blaylock's claims. The Eleventh Amendment precludes Blaylock from suing the state of South Dakota or its agencies, including the DOC,[5] in federal court. *Arlt v. Mo. Dep't of Corrs.*, 229 F. Supp. 2d 938, 942 (E.D. Mo. 2002). But Congress may abrogate a state's Eleventh Amendment immunity if Congress unequivocally intends to do so and acts pursuant to a valid grant of constitutional authority. *Id.* (citing *Bd. of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001)). In *Yeskey*, the Supreme Court held that Congress intended Title II of the ADA to apply to state prisons, but expressly declined to consider whether by doing so Congress was acting pursuant to a valid grant of its legislative power. *Yeskey*, 524 U.S. at 211–13. In *United States v. Georgia*, 546 U.S. 151, 159 (2006), however, the Supreme

---

[5] The DOC was created by the state legislature. *See* SDCL § 1-15-1.2.

Court held that Title II of the ADA validly abrogates a state's Eleventh Amendment immunity for conduct that actually violates the Fourteenth Amendment.

Blaylock's Title II ADA stems from the alleged denial of reasonable accommodations necessary for him to participate in a construction technology class. Docket 18 ¶ 151. But "[p]risoners have no constitutional right to educational or vocational opportunities during incarceration[.]" *Wishon v. Gammon*, 978 F.2d 446, 450 (8th Cir. 1992) (citation modified). Thus, denying Blaylock a reasonable accommodation necessary for him to participate in a construction technology class is not conduct that actually violates the Fourteenth Amendment. Here, however, liberally construing Blaylock's second amended complaint, he also alleges that the failure to provide a reasonable accommodation deprived him of the opportunity to participate safely in the construction technology class. Docket 18 ¶ 151. The Eighth Circuit has recognized that the Eighth Amendment's ban on cruel and unusual punishment extends to conditions of confinement arising out of prison work assignments although it is well established that prisoners do not have a constitutional right to employment while incarcerated. *See, e.g.*, *Kulkay v. Roy*, 847 F.3d 637, 642 (8th Cir. 2017) (recognizing that the protections of the Eighth Amendment extend to prison work assignments); *Scott v. Haynes*, 4:23-CV-04115-RAL, 2024 WL 1049485, at *21 (D.S.D. Mar. 11, 2024) (stating that prisoners have no constitutional right to employment). It follows, therefore, that the Eighth Amendment's ban on cruel and unusual punishment extends to

17

confinement arising out of vocational assignments. Liberally construing Blaylock's second amended complaint, he has sufficiently alleged deliberate indifference to a substantial risk of serious harm regarding his participation in a technology class requiring him to operate table saws and other machinery. Docket 18 ¶¶ 140, 141, 143, 148, 150, 151. Blaylock has not alleged a deliberate indifference conditions-of-confinement claim, and he cannot sue the DOC for damages under 42 U.S.C. § 1983, but this Court must consider his allegations to evaluate whether his Title II ADA claim against the DOC may proceed. On the basis of Blaylock's allegations, the Eleventh Amendment does not bar Blaylock's Title II ADA claim for damages.[6]

> To state a claim under Title II of the ADA, Blaylock must allege
>
> (1) that he is a qualified individual with a disability; (2) that he was excluded from participation in or denied the benefits of the [prison's] services, programs, or activities, or was otherwise subjected to discrimination by the [prison]; and (3) that such exclusion, denial of benefits, or other discrimination was by reason of his disability.

*Rinehart v. Weitzell*, 596 F.3d 465, 484 (8th Cir. 2010) (alterations in original) (internal quotation omitted). Blaylock's second amended complaint sufficiently alleges these essential elements. Docket 18 ¶¶ 146, 147, 148, 151, 152. Thus, Blaylock's Title II ADA claim against the DOC for compensatory[7] damages survives § 1915A screening.

---

[6] As the Court previously noted, Blaylock's claims for injunctive relief are moot because he is no longer incarcerated.

[7] Punitive damages are not available under the Title II of the ADA. *Meagley v. City of Little Rock*, 639 F.3d 384, 390 (8th Cir. 2011). To the extent that Blaylock seeks

> Section 504 of the Rehabilitation Act provides that:
>
> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794(a). "For a prima facie § 504 violation, a qualified individual with a disability must be denied, on the basis of the individual's disability, the benefits of a program or activity of a public entity receiving federal funds." *Folkerts v. City of Waverly*, 707 F.3d 975, 983 (8th Cir. 2013)(citing *M.P. ex rel. K. v. Indep. Sch. Dist. No. 721*, 326 F.3d 975, 981–82 (8th Cir. 2003)). Here, Blaylock alleges that the DOC receives federal funding, that his narcolepsy constitutes a "disability," and to accommodate his disability, he was restricted from operating machinery. Docket 18 ¶¶ 6, 7, 16, 65, 84, 85, 145, 146, 147, 150. Despite this restriction, however, he was placed in a construction technology class that required him to use power saws and other dangerous equipment. *Id.* ¶¶ 89, 91, 95. Thus, because the DOC failed to enforce the no machinery restriction, Blaylock contends that he was denied meaningful access to participate safely in the DOC's educational program. *Id.* ¶¶ 151, 152. Blaylock's Rehabilitation Act claim against the DOC for compensatory[8] damages survives § 1915A screening.

---

punite damages for the alleged violation of the Title II of the ADA, that claim is dismissed under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

[8] Punitive damages are not available under the Rehabilitation Act. *Meagley*, 639 F.3d at 390. To the extent that Blaylock seeks punitive damages for the alleged violation of

### 5.    State-Law Negligence and Medical Malpractice

Blaylock alleges a state-law claim for medical malpractice against Dr. Haynes and Unknown DOC Medical Staff Does 2–5. Docket 18 ¶¶ 155–164. Under 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over all other claims that "form part of the same case or controversy" as the civil action over which this Court has original jurisdiction. Because Blaylock's claims under § 1983, Title II of the ADA, and the Rehabilitation Act  survive § 1915A screening, this Court has supplemental jurisdiction over Blaylock's state-law medical malpractice claims.

"[H]ealthcare providers have a duty under state law to provide care and treatment that complies with the applicable standard of care." *Hunter v. Haas*, 4:24-CV-04170-CCT, 2025 WL 2830261, at *5 (D.S.D. Oct. 6, 2025). "In order to prevail in a suit based on negligence, a plaintiff must prove duty, breach of that duty, proximate and factual causation, and actual injury." *Hanson v. Big Stone Therapies, Inc.*, 916 N.W.2d 151, 158 (S.D. 2018) (quoting *Hamilton v. Sommers*, 855 N.W.2d 855, 861 (S.D. 2014)). "In a suit for professional negligence, the plaintiff must prove that the professional deviated from the required standard of care." *Id.* (citing *Magbuhat v. Kovarik*, 382 N.W.2d 43, 46 (S.D. 1986)).

Blaylock alleges facts sufficient to state a claim for medical malpractice under South Dakota state law. He alleges that Dr. Haynes and Unknown DOC

---

the Rehabilitation Act, that claim is dismissed under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

Medical Staff Does 2–5 owed him a duty to exercise reasonable care and skill when treating his narcolepsy and other psychiatric complaints, that the providers breached their duties, and that he suffered harm as a result of this breach. Docket 18 ¶¶ 156–164. Thus, Blaylock's state-law medical malpractice claim against Dr. Haynes and Unknown DOC Medical Staff Does 2–5 survives § 1915A screening.

## II.    Motion to Seal

In his original complaint, Blaylock requested that his complaint be "filed under seal because it contains extensive personal details, medical information, and psychological details of severe trauma which could result in the disclosure of confidential information to the general public." Docket 1 at 3. When the Court screened Blaylock's initial and amended complaint, the Court ordered Blaylock to show cause within 30 days of the date of the screening order why his entire complaint should remain under seal. Docket 15 at 21–23. Blaylock did not respond to the Order to Show Cause and, therefore, has not complied with D.S.D. Civ. LR 7.1(A). Thus, it is ordered that Blaylock's complaint (Docket 1), motion to appoint counsel (Docket 5), and this Court's Order Granting Plaintiff's Motion for Leave to Proceed in Forma Pauperis and 1915A Screening (Docket 15) shall be unsealed.

## III.    Conclusion

For the reasons discussed above, it is ORDERED:

1.    That Blaylock's claims for declaratory relief and injunctive relief against the DOC and the individual defendants in their official

capacities are dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

2. That Blaylock's Eighth Amendment failure-to-protect claim against Myers, John Doe 1, Reyes, Eilers, and Unknown MDSP Staff, in their individual capacities, survives § 1915A screening.

3. That Blaylock's Eighth Amendment deliberate indifference to serious medical needs claim against Dr. Haynes, Unknown Medical Staff Does 2–5, Wasko, and Reyes, in their individual capacities, survives § 1915A screening.

4. That Blaylock's Title II ADA claim against the DOC for compensatory damages survives § 1915A screening. To the extent that Blaylock seeks punitive damages for the alleged violation of Title II of the ADA, that claim is dismissed under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

5. That Blaylock's Rehabilitation Act claim against the DOC for compensatory damages survives § 1915A screening. To the extent that Blaylock seeks punitive damages for the alleged violation of the Rehabilitation Act, that claim is dismissed under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

6. That Blaylock's state-law medical malpractice claim against Dr. Haynes and Unknown DOC Medical Staff Does 2–5 survives § 1915A screening.

7. That the Clerk shall send six blank summons forms and Marshal Service Forms (Form USM-285) to Blaylock so that he may cause the second amended complaint to be served upon defendants DOC, Myers, Reyes, Eilers, Dr. Haynes, and Wasko.

8. That Blaylock must notify the Clerk when he identifies John Doe 1, Unknown Medical Staff Does 2–5, and the Unknown MDSP Staff so that the Clerk can send additional blank summonses and Marshal Service Forms to Blaylock so that he may cause the second amended complaint to be served upon these defendants.

9. That Blaylock shall complete and send the Clerk of Courts a summons and USM-285 form for each defendant. Upon receipt of the completed summonses and USM-285 forms, the Clerk of Court will issue the summonses. If the completed summonses and USM-285 forms are not submitted as directed within 30 days of the date of this order, the action may be dismissed for failure to prosecute.

10. That the United States Marshal Service shall serve the completed summonses, together with a copy of the second amended complaint (Docket 18) and this order, upon the defendants.

11. That the defendants will serve and file an answer or responsive pleading to the complaint on or before 21 days following the date of service.

12. That Blaylock's complaint (Docket 1), motion to appoint counsel (Docket 5), and this Court's Order Granting Plaintiff's Motion for

23

Leave to Proceed in Forma Pauperis and 1915A Screening (Docket 15) shall be unsealed.

13.    That Blaylock will keep the Court informed of his current address at all times. All parties are bound by the Federal Rules of Civil Procedure and by the Court's Local Rules while this case is pending

Dated July 30, 2026.

BY THE COURT:


/s/ *Camela C. Theeler*
CAMELA C. THEELER
UNITED STATES DISTRICT JUDGE

24